Timothy Caron, Esq.
Celedon Law
277 Main Street, Suite 305
Marlborough, MA 01752
Tel: (508) 573-3170

Attorney for Petitioner

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

LUCAS DOS SANTOS AMARAL            )
                                   )        Case No. __1:25-cv-10279__
          Petitioner,              )
                                   )
v.                                 )
                                   )
Antone Moniz, Superintendent of Plymouth County )
Correctional Facility;             )
                                   )
                                   )
          Respondent.              )
_____)

**PETITIONER'S REPLY TO RESPONDENT'S SUPPLEMENTAL RESPONSE, AND RESPONSE TO RESPONDENT'S OPPOSITION TO REQUEST FOR EAJA FEES AND COSTS**

Now comes Petitioner, Lucas dos Santos Amaral (hereinafter referred to as "Lucas" or "Petitioner"), respectfully filing a reply to Respondent's Supplemental Response filed on March 19, 2025. Additionally, Petitioner responds to Respondent's Opposition to his Request for EAJA Fees and Costs, also filed on March 19, 2025.

As noted in prior filings before the Court, the conduct towards Petitioner by Respondent (and other Government entities) upon Petitioner's apprehension, detention, and subsequent transfers evinces acts taken in bad faith. In particular, the denial of access to Petitioner's attorney falls squarely in line with the hypothetical situation laid out by Justice Anthony Kennedy in his concurring opinion in *Rumsfeld v. Padilla*, 542 U.S. 426 (2004). As a result, these circumstances

1

allow this Court to maintain jurisdiction over the present matter despite Respondent's lack of physical custody over Petitioner at the time of the initial Petition filing.

In support thereof, Petitioner states the following:

## I.    MOOTNESS

Respondent notes that Petitioner is no longer detained by ICE, as he obtained a bond order from an Immigration Judge. Respondent's Supplemental Response to Petitioner's Amended Petition for Writ of Habeas Corpus and Opposition to Petitioner's Request for EAJA Fees and Costs (citing Doc. No. 14 at 16). Therefore, Respondent concludes that because Petitioner has obtained the relief sought from this Court, his Amended Petition is moot and must be dismissed. *Id.*[1]

In support of this argument, Respondent asserts that "Courts routinely dismiss habeas petitions filed by ICE detainees seeking release from custody upon information that such detainee is no longer in ICE custody." *Id.* at *3.[2] Additionally, Respondent states that this Court lacked jurisdiction over Petitioner's habeas petition from the outset because he filed his action in this district court, rather than in the Western District of Texas where he was detained at that time. *Id.* at *4.

---

[1] Citing *Steffel v. Thompson*, 415 U.S. 452, 459 n.10 (1974). U.S. Const. art. III; *U.S. Bancorp Mortgage Co. V. Bonner Mall P'ship*, 513 U.S. 18, 21-22 (1994); *Ashcroft v. Mattis*, 431 U.S. 171, 172-3 (1977); *Overseas Military Sales Corp., Ltd v. Giralt-Armada*, 503 F.3d 12, 17 (1st Cir. 2007).

[2] Citing *e.g., Ahmed v. Moniz*, No. 21-CV-12133-DLC, 2022 WL 17651984, at *2 (D. Mass. July 7, 2022); *Njuguna v. Smith*, Civil Action No. 16-cv-12075-ADB, 2016 WL 6986208, at *1 (D. Mass. Nov. 28, 2016); *Omondiagbe v. McDonald*, No. CIV.A. 13-11182-MBB, 2014 WL 1413560, at *1 (D. Mass. Apr. 10, 2014); *Ali v. Smith*, Civil Action No. 17-11689-GAO, Document No. 9 (Jan. 1, 2018); *Lopez v. Souza*, Civil Action No. 18-10603-RGS, Document No. 8 (April 20, 2018); *Fernandez v. Moniz et al*, Civil Action No. 18-10057-WGY, Document No. 11 (Feb. 5, 2018); *Verde-Llanes v. Moniz*, Civil Action No. 17-11894-LTS, Document No. 18 (Jan. 17, 2018); *Van Dang v. McDonald*, Civil Action No. 17-12293-RGS, Document No. 9 (Dec. 18, 2017); *Long v. McDonald*, Civil Action No. 17-10397, Document No. 15 (March 27, 2017).

The District of Massachusetts retains jurisdiction in the present case, on account of the bad faith actions taken by the government in intentionally depriving Petitioner access to a bond hearing before an Immigration Judge in Massachusetts, as well as its efforts to deprive Petitioner of a habeas case before this Court. These actions were taken in direct violation of two active ICE directives (discussed in depth below). Adherence to these directives would have kept Petitioner detained in Massachusetts. The government's conduct, which interfered with Petitioner's right to effective assistance of counsel, resulted in the posting of excessive bond by an Immigration Judge at Pearsall Immigration Court ($8000). *See* Declaration of Eloa J. Celedon, ¶¶ 13-14.

As a result of these unique circumstances, Petitioner seeks either the return of $8000 or a *de novo* hearing held in a Massachusetts Immigration Court.

## II.    JURISDICTION PURSUANT TO *RUMSFELD V. PADILLA* AND *KHALIL v. JOYCE ET AL.*

Although the Southern District of New York's Opinion and Order issued on March 19, 2025 in *Khalil v. Joyce et al.* No. 1:25-CV-1935 (JMF) (S.D.N.Y. 2025) distinguishes itself from Justice Kennedy's concurring opinion in *Rumsfeld v. Padilla*, 542 U.S. 426 (2004), it nonetheless illustrates that opinion's applicability to the present case. In these circumstances, the bad faith conduct of the government warrants this Court retaining jurisdiction.

In *Padilla*, the Supreme Court looked to the "plain language" of the federal habeas statute — which limits district courts to granting relief "within their respective jurisdictions," 28 U.S.C. § 2241 — to conclude that a habeas petition naming a prisoner's custodian can be filed in only one district: "the district of confinement." 542 U.S. at 442 (internal quotation marks omitted).

Applying the immediate-custodian[3] and district-of-confinement[4] rules, the Supreme Court concluded that Padilla's petition could not be heard in the Southern District of New York. *Id.* at 427. The Court acknowledged that Padilla's detention was "undeniably unique in many respects" but declared that, "at bottom," it was "a simple challenge to physical custody imposed by the Executive…There is no indication that there was any attempt to manipulate behind Padilla's transfer . . . , and the Government did not attempt to hide from Padilla's lawyer where it had taken him." *Id.* at 441-2.

In *Padilla*, Justice Anthony M. Kennedy, joined by Justice Sandra Day O'Connor, issued a concurring opinion in which he observed that he would "would acknowledge an exception" to the district-of-confinement and immediate-custodian rules "if there is an indication that the Government's purpose in removing a prisoner were to make it difficult for his lawyer to know where the habeas petition should be filed, or where the Government was not forthcoming with respect to the identity of the custodian and the place of detention." 542 U.S. at 454 (Kennedy, J., concurring). Justice Kennedy noted that if "the Government had removed Padilla from the Southern District of New York but refused to tell his lawyer where he had been taken," he would have concluded that the Southern District of New York "had jurisdiction over the petition. Or, if the Government did inform the lawyer where a prisoner was being taken but kept moving him so a filing could not catch up to the prisoner, again, in [his] view, habeas jurisdiction would lie in the district or districts from which he had been removed." *Id.*

---

[3] *Id.* at 435 (citing  *Hogan v. Hanks*, 97 F. 3d 189, 190 (CA7 1996); *Brittingham v. United States*, 982 F. 2d 378, 379 (CA9 1992); *Blango v. Thornburgh*, 942 F. 2d 1487, 1491-1492 (CA10 1991) (per curiam); *Brennan v. Cunningham*, 813 F. 2d 1, 12 (CA1 1987); *Guerra v. Meese*, 786 F. 2d 414, 416 (CADC 1986) (per curiam); *Billiteri v. United States Bd. of Parole*, 541 F. 2d 938, 948 (CA2 1976); *Sanders v. Bennett*, 148 F. 2d 19, 20 (CADC 1945); *Jones v. Biddle*, 131 F. 2d 853, 854 (CA8 1942)).
[4] *Id.* at 428 (citing *Carbo v. United States*, 364 U.S. 611, 618 (1961)).

In *Khalil*, the petitioner prominently cited Kennedy's concurring opinion in arguing that the Southern District of New York was the proper jurisdiction for his case. 1:25-CV-1935 (JMF), at *2 (S.D.N.Y. 2025). However, the District Court observed that "it is not clear that Justice Kennedy's opinion is the law of the land; nor has any court ever found that his exceptions applied."[5] *Id.* at *3.

Despite this conclusion, the District Court in *Khalil* did not actually decide "whether Justice Kennedy's exceptions are good law." *Id.* at *18. That is because in the opinion of the Court, regardless of whether such exceptions would qualify as good law, "Khalil's attempts to invoke them [fell] short." *Id.* In considering the applicability of those exceptions to Khalil's transfer from 26 Federal Plaza in the District of New York to the Elizabeth Detention Facility in the District of New Jersey, the Court articulated two central questions: whether (1) "there is an indication that the Government's purpose in removing" Khalil to the District of New Jersey was "to make it difficult for his lawyer to know where the habeas petition should be filed" and (2) whether, at the time of filing, "the Government was not forthcoming with respect to the identity of the custodian and the place of detention." *Id.* (citing *Padilla*, 542 U.S. at 454)(Kennedy, J., concurring)).

The District Court concluded that the petitioner had failed to allege "any facts giving rise to the plausible inference that the Government's 'purpose' in moving him to New Jersey was 'to make it difficult for his lawyer to know where the habeas petition should be filed.'" *Id.* at *18-19. The Court attested "from its own experience" that noncitizens arrested and detained by

---

[5] The District Court acknowledged several decisions citing to Justice Kennedy's opinion. *See, e.g., Salcedo v. Decker*, No. 18-CV-8801 (RA), 2019 WL 339642, at *2 n.3 (S.D.N.Y. Jan. 18, 2019); *Sow v. Whitaker*, No. 18-CV-11394 (GBD) (RWL), 2019 WL 2023752, at *5; *Redding v. Thompson*, No. 17-CV-2740, 2018 WL 850147, at *6 (D. Minn. Jan. 23, 2018); *Xia v. King*, No. 24-cv-2000, 2025 WL 240792, at *2 (D. Minn. Jan 17, 2025); *Russell v. Bureau of Prisons*, No. 20-CV-1082, 2021 WL 7208910, at *4 n.5 (E.D. Ark. Sept. 27, 2021); *Vidal-Martinez v. Prim*, No. 20-CV-5099, 2020 WL 6441341, at *5 n.6 (N.D. Ill. Nov. 3, 2020); *see also Fuentes v. Choate*, No. 24-CV-1377 (NYW), 2024 WL 2978285, at *8 (D. Colo. June 13, 2024) (describing Justice Kennedy as having "proposed" exceptions to the immediate-custodian rule).

immigration authorities in New York City "are routinely processed at 26 Federal Plaza and then transferred to New Jersey for detention." *Id.* at *19 (citing *Suraiya*, No. 18-CV-6628 (JMF), ECF No. 17; *Thomas*, No. 19-CV-8690 (JMF), ECF No. 26; *Tazu*, No. 19-CV-1716 (JMF), ECF No. 14; *Traore*, No. 18-CV-7909 (JMF), ECF No. 9). Against this backdrop, the Court could not conclude that the Government's transfer of Khalil from New York to New Jersey was done to prevent his lawyer from promptly challenging his detention in federal court. *Id.*

Furthermore, the Court noted that all of this activity took place while the federal courts were closed. *Id.* at *19-20 ("It would have been one thing if the Government had covertly transferred Khalil at a time when federal courts were able and ready to consider a habeas petition."). The Court also cited to provided sworn declarations in which the Government attested that Khalil's transfer was "a function of its standard operating procedures and 'operational considerations.'" *Id.* at *20 (citing " Mar. 17, 2025 Joyce Decl. ¶ 13). The declarations affirmed that noncitizens arrested by immigration authorities in New York are "often detained at facilities in other [areas of responsibility]" due to the "lack of available detention space" in New York. *Id.* (citing Mar. 17, 2025 Joyce Decl. ¶¶ 8-9). The Court further noted that Khalil did not controvert these explanations, and that such explanations "are consistent with the Court's experience and the case law cited…" *Id.*

The Court in *Khalil* also believed that consideration of Khalil's later transfers – "on the theory that they shed light on the Government's purpose in transferring him to New Jersey" — would not warrant a different conclusion. *Id.* at 21. It cited to the "practical, and unfortunate, reality" that "the Government regularly transfers detained noncitizens between facilities, often multiple times." *Id.* (citing *Garland v. Aleman Gonzalez*, 596 U.S. 543, 570 (2022) (Sotomayor, J., concurring in the judgment in part and dissenting in part); *see also Demore v. Kim*, 538 U.S.

6

510, 554 (2003) (Souter, J., concurring in part and dissenting in part) (immigration officials "detain, transfer, and isolate aliens away from their lawyers, witnesses, and evidence"); *Anariba v. Dir. Hudson Cnty. Corr. Ctr.*, 17 F.4th 434, 448 (3d Cir. 2021) ("continuous transfer" can "permeate[] the reality of ICE detention").

The Court further noted that "transfers to remote locations are routinely made without any prior notice to counsel." *Id.* (citing *Anariba*, 17 F.4th at 448 ("the Government often repeatedly moves ICE detainees to remote locations far from counsel or their community without informing counsel of the transfer" (internal quotation marks omitted))); *Bell v. Ashcroft*, No. 03-CV-766 (HB), 2003 WL 22358800, at *3 (S.D.N.Y. Oct. 15, 2003) ("aliens in federal custody are routinely transferred . . . to other, often far-away, facilities").

In Judge Furman's opinion, "[h]owever unusual or disturbing the circumstances leading to Khalil's arrest and detention may have been, his transfers from facility to facility do not appear to be…unusual enough for the Court to disregard the 'longstanding' district-of-confinement and immediate-custodian rules." *Khalil*, at *22.

In short, the Court concluded that the full record did not support the idea that "the government played forum games or kept moving [Khalil] so that his filing could not catch up." *Id.* at *23 (citing *Griffin v. Ebbert*, 751 F.3d 288, 290 & n.2 (5th Cir. 2014).

The Court then turned to Kennedy's second proposed exception — for when "the Government was not forthcoming with respect to the identity of the custodian and the place of detention," *Id.* (citing *Padilla*, 542 U.S. at 454 (Kennedy, J., concurring)). Although the Court acknowledged that "the exception does not appear to require any showing of improper purpose," it nonetheless found in favor of the Government on the relevant question (whether the Government was insufficiently forthcoming as to Khalil's detention in New Jersey). *Id.*

At the moment of arrest, the Government informed Khalil's wife and his attorney that he was being taken to 26 Federal Plaza. *Id.* (citing Petition ¶¶ 51, 53). Between then and the filing of the petition, Khalil's attorney never asked a Government official for additional information about Khalil's whereabouts. *Id.* Instead, his attorney relied on ICE's online Detainee Locator, which did not reflect Khalil's transfer from New York to New Jersey "in the middle of the night on a weekend when, as noted, Khalil's lawyer could not even have obtained the relief that he later sought." *Id.* (citing Petition ¶ 55; Mar. 17, 2025 Joyce Decl., ¶ 16). Thus, "the Government had done nothing to materially frustrate Khalil's access to the Great Writ." *Id.*

Moreover, the overnight delay in updating the online Detainee Locator, without more, was not enough to support an "inference of Government secrecy." *Id.* (citing *Padilla*, 542 U.S. at 450).

Therefore, the District Court in *Khalil* concluded that before it was *not* the exceptional scenario Justice Kennedy imagined, in which "the Government had removed [its detainee] from the Southern District of New York but refused to tell his lawyer where he had been taken." *Id.* at *24 (citing *Padilla*, 542 U.S. at 454 (Kennedy, J., concurring)).

In the present case, in contrast to the facts in *Padilla* and *Khalil*, there are circumstances indicating manipulative attempts on the part of the authorities behind Petitioner's transfer from Plymouth Detention Facility in Plymouth, MA to Karnes County Immigration Processing Center in San Antonio, TX. Furthermore, despite efforts made by Petitioner's counsel, the Government was not forthcoming in terms of disclosing where they had taken him. *See* Declaration of Eloa J. Celedon ¶¶ 3-8. These circumstances fall directly in line with Justice Kennedy's proposed exception in *Padilla*, as they constitute an indication "that the Government's purpose in removing a prisoner [was] to make it difficult for his lawyer to know where the habeas petition should be filed, or where the Government was not forthcoming with respect to the identity of the custodian

and the place of detention." 542 U.S. at 454 (Kennedy, J., concurring). Even after counsel was informed of Petitioner's transfer to Karnes County Immigration Processing Center, he was soon transferred to a detention facility in Pearsall, TX – contributing to confusion over the proper venue of his custody redetermination hearing. *See* Declaration of Eloa J. Celedon ¶¶ 7-8. In fact, it was not until the very morning of Petitioner's custody determination hearing that the actual venue was confirmed for his counsel. *Id.* ¶¶ 11-12.

Petitioner has alleged numerous facts giving rise to a plausible inference that the Government's purpose in moving him to Texas was to make it difficult for his lawyer to know where the habeas petition should be filed. Furthermore, there is no evidence in the record demonstrating that noncitizens arrested and detained by immigration authorities in Massachusetts are frequently transferred to Texas for detention after routine processing. *See* Declaration of Assistant Field Office Director Keith Chan.

Unlike in *Khalil*, counsel's inquiry regarding Petitioner's location began while the federal courts were open and thus "able and ready to consider a habeas petition." *See* Declaration of Eloa J. Celedon ¶ 5; *Khalil v. Joyce et al.* No. 1:25-CV-1935 (JMF) at *19-20 (S.D.N.Y. 2025). Respondent has not provided a sworn declaration attesting that Petitioner's transfer was a function of standard operating procedures and operational considerations. *See* Declaration of Assistant Field Office Director Keith Chan. Any explanations proffered by Respondent are inconsistent with

the relevant case law. Additionally, the bad faith intent behind Respondent's actions is evinced by

the wider conduct of the Trump Administration in its national immigration policies.[6][7][8][9][10][11][12]

---

[6] "The transfer of Ozturk appeared to violate a federal court order from Tuesday, which directed the DHS and Ice to give the court 48 hours' notice before attempting to take her out of Massachusetts…Tuesday's detention is the latest in a series of arrests of students who are not accused of any crime but have been involved in pro-Palestinian activism on student campus, in a sharp escalation of anti-immigration crackdowns…by the Trump administration. In a statement, a DHS spokesperson said on Wednesday that Ozturk had been 'granted the privilege to be in this country on a visa'. Without supplying any proof, the spokesperson accused her of supporting Hamas." Jose Olivares, *Judge orders Trump administration to explain Ice detention of Tufts student*, THE GUARDIAN (Mar. 27, 2025), https://www.theguardian.com/us-news/2025/mar/27/judge-explanation-tufts-student-rumeysa-ozturk-ice.

[7] "The Trump administration received pointed questions from a judge over how it's implementing a rarely used wartime law to deport Venezuelans suspected of being Tren de Aragua gang members. A president last invoked the Alien Enemies Act after the attack on Pearl Harbor, designating Japanese, German and Italian nationals as 'alien enemies' during World War II. 'Nazis got better treatment under the Alien Enemies Act than what has happened here,' D.C. Circuit Court of Appeals Judge Patricia Millett said during a hearing at the court on Monday. 'And they had hearing boards before they were removed.' 'People weren't given notice. They weren't told where they were going,' she said about the removal of Venezuelans and others to El Salvador this month." Ximena Bustillo, *Judge contends Nazis got more due process than Trump deportees did*, NPR (Mar. 24, 2025), https://www.npr.org/2025/03/24/nx-s1-5338794/appeals-alien-enemies-act-trump.

[8] "What began as a promise to remove dangerous criminals has now widened into a sweeping net that ensnares hardworking, law-abiding legal residents and community members. According to Vanessa Cárdenas, Executive Director of America's Voice:

'The Trump Administration is not going only after hardened criminals, they are inflicting widespread harm on legal and long-settled individuals and families. What we are witnessing is the ruthless, random and chaotic targeting of legal residents and hard-working individuals who have done nothing more than live their lives in a nation they call home. This expanding dragnet is now ensnaring people who contribute to our economy, raise families, and are deeply embedded in our neighborhoods…We must ask ourselves: at what cost are we willing to let this continue?'…

These stories show the real impact of this aggressive agenda on our communities:

The New York Times…says:

'On March 5, Ms. Chung protested outside a Barnard College building where pro-Palestinian student demonstrators were holding a sit-in. She was arrested by police officers, given a desk appearance ticket on the misdemeanor charge of obstructing governmental administration and released. Four days later — and the day after Mr. Khalil was arrested — immigration officials appeared at the home of Ms. Chung's.'…

The New Republic…says:

'It probably never crossed Fabian Schmidt's mind that he wouldn't breeze through security at Boston's Logan Airport. A legal resident of New Hampshire, he flew back to the United States on March 7 after a visit to Luxembourg, but never made it through security. According to his mother, who didn't get to speak with him until four days later, Schmidt was "violently interrogated" for hours, stripped naked, and forced into a cold shower. Given little food or water, suffering from sleep deprivation, and prevented from taking anxiety and depression medication, he collapsed and was hospitalized (where he learned he also had the flu), she said.'"

*"At What Cost?": More Legal Immigrants Get Caught on Trump's Immigration Dragnet*, AMERICA'S VOICE (Mar. 25, 2025), https://americasvoice.org/press_releases/at-what-cost-more-legal-immigrants-get-caught-on-trumps-immigration-dragnet/.

[9] "President Donald Trump's 'border czar' Tom Homan doubled down on the administration's mass deportation campaign on Monday, saying he plans to continue the aggressive roundups and removals despite court rulings and injunctions halting them. 'We're not stopping,' Homan told Fox News in an interview. 'I don't care what the judges think. I don't care what the left thinks. We're coming.' In recent weeks, several judges have put a halt to some elements of the deportation effort, including a federal judge on Saturday who ordered that planes carrying suspected Venezuelan gang members be turned back to the United States while on their way to El Salvadoran prisons. The Trump administration has deported as many as 300 alleged members of the Venezuelan gang Tren de Aragua

Even if there is evidence to indicate that detained noncitizens are regularly transferred repeatedly between facilities without prior notice to counsel, Petitioner's multiple transfers are rendered "unusual enough" in the context of the record before this Court, and so they shed light on the Government's purpose in transferring him to Texas in the first place. *Khalil v. Joyce et al.* No. 1:25-CV-1935 (JMF) at *22 (S.D.N.Y. 2025).

---

under the Alien Enemies Act despite Chief U.S. Judge James Boasberg's order in Washington, D.C., blocking the flights under the 1798 law last wielded during World War II…The Trump administration says the suspected Tren de Aragua members are being deported on national security concerns. But lawyers say they have not been given due process, and legal questions about the weekend activity is the focus of court battles on Monday and expected throughout the week…During his Fox News interview, Homan also indicated that the White House and Department of Homeland Security planned to keep the deportation effort going despite rulings from the bench. 'You're going against the judges now, what's next?' Fox & Friends co-host Lawrence Jones asked Homan. 'Another flight' Homan said. 'Another flight every day.' Homan also said teams of Immigration and Customs Enforcement (ICE) agents would continue to be out every day, 'in the neighborhoods of this nation arresting criminal illegal aliens, public safety threats and national security threats. They're not going to stop us.' Josh Meyer, *'We're not stopping': Trump border czar vows deportations to continue despite court orders*, USA Today (Mar. 17, 2025), https://www.usatoday.com/story/news/politics/2025/03/17/trump-deportation-border-czar-tom-homan-court-order/82499391007/.

[10] "Lawyers providing detainees with basic legal information in federal immigration detention centers were shut out of facilities last week after the U.S. Department of Justice halted several federally funded programs. One program provided lawyers to children in deportation proceedings and another dispensed basic legal information. The move is part of President Trump's broader push to weaken or sideline the parts of the immigration system that support detainees. The Department of Justice declined a request to comment…'The suspension of these longstanding programs could leave hundreds of thousands of vulnerable immigrants — including children and families — without access to basic legal information and representation,' said Shaina Aber, executive director of the Acacia Center for Justice, in a statement." Rachel Uranga, *Justice Dept. halts legal programs for detained immigrants, cuts off advocates' access to facilities*, Los Angeles Times (Jan. 27, 2025), https://www.latimes.com/california/story/2025-01-27/some-lawyers-for-detained-children-lose-access-as-doj-halts-programs.

[11] "The arrests of 370 people in Massachusetts by U.S. Immigration and Customs Enforcement last week included many 'collaterals,' President Trump's 'border czar' Tom Homan says…'How come the collaterals? I've said this a thousand times, sanctuary cities are going to get exactly what they don't want, more agents in the community and more collateral arrests.' Homan couldn't specify how many of those arrested in the Boston area were 'collaterals.'" Neal Riley, *Boston ICE arrests included many "collaterals," Trump "border czar" Tom Homan says*, CBS News (Mar. 26, 2025), https://www.cbsnews.com/boston/news/boston-ice-arrests-collaterals-tom-homan/.

[12] "President Donald Trump's high-profile effort to transfer migrants from the United States to the Naval base at Guantanamo Bay, Cuba is being buffeted by concerns…over living conditions there and the arduous, expensive process of making it a suitable site for deportees. Last month, the administration took the unprecedented step of sending migrants to Guantanamo Bay on US military aircraft, sparking fierce backlash from immigrant advocates and prompting a lawsuit from immigrant advocacy groups…CNN reported in February that plans to house migrants in tents were being halted amid concerns the structures didn't meet detention standards required by Immigration and Customs Enforcement…Democrat Rep. Sara Jacobs, who visited the base last week as part of a congressional delegation visit…[told CNN] 'What we saw really was that there is very low capacity there, and it's really expensive, and I could see no operational reasons for using Guantanamo Bay for immigration detention…It was clearly just because Donald Trump liked the optics.' The Defense Department declined to comment for this article and referred further questions to ICE. The Department of Homeland Security did not respond to a request for comment." Haley Britzky, Priscilla Alvarez, and Annie Grayer, *Trump plan to house migrants at Guantanamo Bay faces mounting hurdles, internal doubts*, CNN (Mar. 14, 2025), https://www.cnn.com/2025/03/14/politics/guantanamo-migrants-trump/index.html.

In summary, Petitioner has alleged facts indicating that his transfer from Massachusetts to Texas was done for an improper purpose and that the Government was not forthcoming about his whereabouts in a way that meaningfully affected his ability to seek or obtain judicial review of his detention.

## III.    BAD FAITH CONDUCT FURTHER DEMONSTRATED BY FAILURE TO ADHERE TO ICE POLICY DIRECTIVES

Recently, Petitioner came into possession (by means of a FOIA request) of U.S. ICE Policy 11022.1: Detainee Transfers (hereinafter referred to as the "Transfers Directive"), which was issued on January 4, 2012. *See* Exhibit F, U.S. Immigr. & Customs Enf't, 305-112-002b, Policy 11022.1 Detainee Transfers (Jan. 4, 2012), available at https://www.ice.gov/doclib/detention-reform/pdf/hd-detainee-transfers.pdf. The stated purpose of the Transfers Directive is to establish "new prioritized transfer determinations that are meant to minimize, to the extent possible, detainee transfers outside the area of responsibility and to provide cost savings to the agency." *Id.* ¶ 1. Furthermore, the Transfers Directive is intended to "consolidate[] and revise[] existing policies on how field offices make detainee transfer determinations and conduct[] transfers out of the Area of Responsibility [geographic area of responsibility under the authority of a Field Office Director]." *Id.* Any detainee transfers and transfer determinations are to be based on "a thorough and systematic review of the most current information available." *Id.* ¶ 2. Field Office Directors, Supervisory Immigration Officers, and Immigration Officers are each responsible for complying with the policy and procedures set forth in the Transfers Directive. *Id.* ¶ 4.1. Additionally, Field Office Directors are responsible for disseminating and enforcing the Transfers Directive. *Id.* ¶ 4.2.

Unless a Field Office Director or their designee deems a transfer to be necessary, Supervisory Immigration Officers are *not* to transfer a detainee when there is documentation to support the presence of immediate family within the AOR or the presence of an attorney of record

within the AOR (per a filed Form G-28, Notice of Entry of Appearance as Attorney or Accredited

Representative). *Id.* ¶ 5.2(1)(a-b). (emphasis added).

An Immigration Officer is to conduct a review to determine whether these factors are

present. *Id.* ¶ 5.2(2). Should a Field Office Director override such factors, the resulting transfer

must be approved at the Assistant Field Office Director level or higher, and the reasons for the

transfer must be documented in the detainee's A-File. *Id.*

A transfer may be deemed necessary by a Field Office Director or their designee for any

of the following reasons:

> a) To provide appropriate medical or mental health care to the detainee.
> b) To fulfill an approved transfer request by the detainee.
> c) For the safety and security of the detainee, other detainees, detention personnel or any ICE employee.
> d) At ICE's discretion, for the convenience of the agency when the venue of EOIR proceedings is different than the venue in which the alien is detained.
> e) To transfer to a more appropriate detention facility based on the detainee's individual circumstances and risk factors.
> f) Termination of facility use due to failure to meet ICE detention standards, lack of sufficient use of the facility by ICE, or emergent situations.
> g) To relieve or prevent facility overcrowding; in such cases, efforts should first be made to identify for transfer those detainees who do not meet any of the criteria listed in section 5.2(1). *Id.* ¶ 5.2(3).

Should a detainee transfer occur, ICE is to ensure that "all necessary notifications are made

to detainees and their attorneys." *Id.* ¶ 5.3(1). If the detainee has an attorney of record, the sending

field office is to notify said attorney that the detainee is being transferred – including the reason

for the transfer; and the name, location, and telephone number of the new facility "as soon as

practicable on the day of the transfer, but in no circumstances later than twenty four (24) hours

after the transfer occurs." *Id.* ¶ 5.3(2)(a). Such notification may be delayed only if there are "special

security concerns, but only for the period of time justified by those concerns." *Id.* ¶ 5.3(2)(c).

The Transfers Directive also includes a "No Private Right Statement," declaring that the Transfers Directive is "an internal policy statement of ICE…[that] is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter." *Id.* ¶ 8.

Petitioner is also aware of ICE Directive 11064.3: Interests of Noncitizen Parents and Legal Guardians of Minor Children or Incapacitated Adults (hereinafter referred to as the "Parents Directive"), which was issued on July 14, 2022 (*see* Exhibit G, U.S. Immigr. & Customs Enf't, Policy 11064.3 Interests of Noncitizen Parents and Legal Guardians of Minor Children or Incapacitated Adults (Jul. 14, 2022), available at https://www.ice.gov/doclib/news/releases/2022/11064.3.pdf). The stated purpose of the Parents Directive is to establish "ICE policy and procedures regarding the preservation of the parental and/or guardianship rights of noncitizen parents and legal guardians." *Id.* ¶ 1. Furthermore, the Parents Directive declares that the policy of ICE is to "to ensure that the agency's civil immigration enforcement activities do not unnecessarily disrupt or infringe upon the parental or guardianship rights of noncitizen parents or legal guardians of minor children or incapacitated adults, consistent with all legal obligations and applicable court orders." *Id.* ¶ 2. The Parents Directive applies to "noncitizen parents or legal guardians who are…primary caretakers or have custody of minor child(ren) or incapacitated adults in the United States, without regard to the dependent's citizenship or immigration status." *Id.*

Upon the detention of such a noncitizen parent, if their minor child for whom they serve as a legal guardian is within the area of responsibility of the initial apprehension, the Field Office Director for that area *must* refrain from subsequently transferring the noncitizen outside of the area of responsibility, unless maintaining custody within the area is "impracticable" or doing so is

"dictated by exceptional circumstances or otherwise legally required." *Id.* ¶ 5.3(1) (emphasis added). Where detention is appropriate, the Field Office Director *must* place the noncitizen "as close as practicable" to their minor child. *Id.* ¶ 5.3(2) (emphasis added). Additionally, the ERO must develop "a system for maintaining [information related to the noncitizen] in a manner that permits continuous monitoring and tracking of such individuals to ensure compliance with the Directive." *Id.* ¶ 5.12.

The Parents Directive also includes a "No Private Right Statement," with nearly identical language to the "No Private Right Statement" in the Transfers Directive. *Id.* ¶ 9.

### a. Recognized Enforceability of ICE Directives under Federal Law

In *Aracely v. Nielsen*, 319 F.Supp.3d 110 (D.D.C. 2018), the District Court considered a 2009 directive issued by ICE in the plaintiffs' efforts to obtain preliminary injunctive relief over parole determinations. *Id.* The plaintiffs contended that "immigration officials routinely and systematically failed to abide by a binding, official agency directive governing parole determinations, and instead applied an unwritten, unconstitutional policy promulgated by top policy makers." *Id.* at 120. Therefore, the plaintiffs sought preliminary injunctive relief compelling the Department of Homeland Security to comply with the official directive and halt the alleged unwritten policy, pursuant to the Administrative Procedure Act. *Id.*

The directive at issue (ICE Directive No. 11002.1: Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture (the "Morton Directive") (Dec. 8, 2009)) set forth "certain procedures that must be utilized and factors that, according to [p]laintiffs, must be considered when evaluating parole requests under 8 C.F.R. § 212.5." *Aracely*, 319 F.Supp.3d at 122.

According to the Morton Directive, when an arriving alien found to have a credible fear of persecution establishes, to the satisfaction of ICE, his or her identity and that he or she presents neither a flight risk nor a danger to the community, "[ICE] should, absent additional factors ... parole the alien on the basis that his or her continued detention is not in the public interest." *Id.* (citing ICE Directive No. 11002.1: Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture ¶ 8.3.)

As the Court was considering the matter of potential preliminary injunctive relief, it noted that the movant(s) – in showing whether they were entitled to such relief – must establish that they were likely to succeed on the merits; that they were likely to suffer irreparable harm in the absence of preliminary relief; that the balance of the equities tipped in their favor; and that an injunction was in the public interest. *Aracely*, 319 F.Supp.3d at 125 (citing *Winter v. Nat'l Res. Def. Council, Inc.*, 129 S.Ct. 363 (2008)).

When deliberating on the likelihood of success on the merits, the Court addressed DHS' argument that because the Morton Directive at issue was not a regulation, "it lack[ed] the force of law and [could not] sustain either a constitutional claim or claim based on a question of law." *Aracely*, 319 F.Supp.3d at 149 (citing Defs.' Am. Opp'n at 20). Ultimately, the Court was unconvinced by this argument. *Id.* It noted that "[a]n agency is bound to adhere to its own regulations" – a principle first established by the Supreme Court in *U.S. ex rel. Accardi v. Shaughnessy*. *See* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954). *Aracely*, 319 F.Supp.3d at 149. In that case, an alien challenged the Board of Immigration Appeals' decision to deny his application to suspend deportation, arguing that the Attorney General prejudiced the Board's decision in contravention of regulations directing the Board to exercise its own discretion. 347 U.S. at 261– 62, 74 S.Ct. 499. Agreeing with the alien, the Court ordered a new Board hearing because of "the

Board's alleged failure to exercise its own discretion, contrary to existing valid regulations." *Id*. at 268, 74 S.Ct. 499.

The Court in *Aracely* noted that this principle was subsequently expanded to cover internal agency policies in *Morton v. Ruiz*, 415 U.S. 199, 204–06, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974), which involved a dispute over whether Native Americans were eligible for certain federal benefits. *Aracely*, 319 F.Supp.3d at 150. An internal agency manual dictated that the eligibility requirements should have been published in the Federal Register by the agency administering the benefits program, but the agency had not published them. *Morton v. Ruiz*. at 234–35, 94 S.Ct. 1055. The Court held that the agency's failure to comply with its internal manual was arbitrary and capricious under the APA because "[w]here the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures ... even where the internal procedures are possibly more rigorous than otherwise would be required." *Id*. at 235, 94 S.Ct. 1055.

The Court in *Aracely* also pointed to *Doe v. Hampton*, 566 F.2d 265 (D.C. Cir. 1977*)*, where a physically disabled plaintiff challenged her termination because the defendant agency failed to comply with an internal manual dictating that the agency should reassign the plaintiff or grant her leave without pay before terminating her. *Aracely*, 319 F.Supp.3d at 150. In directing the district court to resolve whether the agency was bound to its manual, the D.C. Circuit noted that "some unpublished provisions may be binding [on the agency] if so intended [by the agency] ... as ascertained by an examination of the provision's language, its context, and any available extrinsic evidence." *Doe v. Hampton*, 566 F.2d at 281; *see also INS v. Yang*, 519 U.S. 26, 31–32, 117 S.Ct. 350, 136 L.Ed.2d 288 (1996) ("Though the agency's discretion is unfettered at the outset, if it announces and follows—by rule or by settled course of adjudication—a general policy by which its exercise of discretion will be governed, an irrational departure from that policy (as opposed to

an avowed alteration of it) could constitute action that must be overturned as 'arbitrary, capricious, [or] an abuse of discretion' "); *Lopez v. FAA*, 318 F.3d 242, 246–48 (D.C. Cir. 2003) ("[A]gencies cannot 'relax or modify' regulations that provide the only safeguard individuals have against unlimited agency discretion in hiring and termination.").

The Court in *Aracely* concluded that the Morton Directive contained provisions making clear that it governed the rights of POE asylum seekers requesting parole, and therefore that it could support an APA claim. *Aracely*, 319 F.Supp.3d at 151 (citing *Morton*, 415 U.S. at 235, 94 S.Ct. 1055). The Morton Directive laid out specific factors to be applied when making individual parole determinations, and it established procedural rights for asylum seekers in connection with the parole process. *Id.* The Morton Directive stated that its purpose was to "ensure transparent, consistent, and considered ICE parole determinations for arriving aliens seeking asylum in the United States." *Id.* (citing Morton Directive ¶ 1). More specifically, it purported to explain "how [8 C.F.R. § 212.5(b)(5)] is to be interpreted by DRO when it decides whether to parole arriving aliens determined to have a credible fear." *Id.* (citing Morton Directive ¶ 4.4.25).

The Morton Directive stated that "when an arriving alien ... establishes to the satisfaction of DRO his or her identity and that he or she presents neither a flight risk nor danger to the community, DRO should, absent additional factors ... parole the alien on the basis that his or her continued detention is not in the public interest." *Id.* (citing Morton Directive ¶ 6.2). The Morton Directive proceeded to explain how a parole applicant may establish his or her identity and prove that he or she is not a flight risk or a danger to the community. *Id.* (citing Morton Directive ¶ 8.3). It also explained that the "additional factors" that may be considered include "serious adverse foreign policy consequences that may result if the alien is released or overriding law enforcement interests." *Id.* (citing Morton Directive ¶ 8.3(4)). In addition, the Morton Directive established a

serious of procedural requirements for ICE officials making parole determinations. *Id.* (citing Morton Directive ¶¶ 6.1, 6.2, 6.5–6.7). By its text, the Morton Directive imposed procedural and substantive obligations under which "its exercise of discretion will be governed," and the rights of parole seekers will be impacted. *Aracely*, 319 F.Supp.3d at 151 (citing *Yang*, 519 U.S. at 31–32, 117 S.Ct. 350).

The Court in *Aracely* further recognized that the plaintiffs had persuasively contended that DHS had indicated "an intent to be bound" by the directive at issue. *Id.* First, it noted that the directive indicates "that ICE officials must comply with its guidance." *Id.* The Court also observed that the Morton Directive established a "quality assurance procedure, including nationwide monthly compliance analyses." *Id.* (citing Morton Directive ¶ 8.11).

DHS urged the Court to weigh heavily the Morton Directive's disclaimer that it "is not intended to, shall not be construed to, may not be relied upon to, and does not create, any rights, privileges, or benefits, substantive or procedural, enforceable by any party against the United States." *Id.* (citing Morton Directive ¶ 10). They argued that this language insulated the Morton Directive from forming the basis of the plaintiffs' APA claims. *Id.* at 152. However, the Court was not convinced that "an agency can avoid challenges based on a policy that appears to be binding and that impacts the rights of individuals, simply by including a boilerplate disclaimer." *Id.* (citing *Damus v. Nielsen*, 313 F.Supp.3d 317 (D.D.C. 2018).

Because the Court in *Aracely* determined that the Morton Directive was binding on the defendants, and because the plaintiffs had demonstrated the incompatibility of the deterrence policy at issue and the Directive, it concluded that that plaintiffs had "met their burden of showing a likelihood of success on the merits of their APA challenge to Defendants' deterrence policy." *Id.* at 154 (citing *Venetian Casino Resort, L.L.C. v. E.E.O.C.*, 530 F.3d 925, 934–35 (D.D.C. 2008).

The Court therefore ordered that the plaintiffs' application for a preliminary injunction be granted in part. *Id.* at 157.

The Transfers Directive was itself discussed in *Alvarez v. Sessions*, 338 F.Supp.3d 1042 (N.D. Cal. 2018). In that case, each petitioner was represented by an attorney within the San Francisco area of responsibility, but they were nonetheless transferred out of state, "contrary to the policy [of the Transfers Directive]." *Id.* at 1050. Although the Court was ultimately compelled to dismiss the case per application of the law, it nonetheless took ample opportunity to criticize ICE for its failure to comply with its own directive. The Court noted that the agency had "offered no response in this action to its flagrant failure," other than to say, "it conducted a review of other issues." *Id.* In this context, ICE's silence was regarded as "deafening." *Id.*

Furthermore, the speed at which some of the petitioners' cases had been transferred to immigration courts in other states ("without regard for the presence of counsel in San Francisco") troubled the Court:

> As a matter of optics, a policy which condones the movement of detained, represented immigrants without notice to their counsel, and leads to the immediate transfers their cases out of the area, does little to inspire public confidence in the executive's ability to fairly and responsibly adjudicate immigration cases. *Id.*

In sum, the Court made it clear that its order "should not interpreted as a judicial approval of ICE's decision to transfer Petitioners…[T]he law does not compel it to countenance an agency's action that is contrary to the norms of this country's justice system…" *Id.* at 1050-51.

### b. Further Rationale in Support of Enforcing the Transfers and Parents Directives

Evidence indicates that the Transfers Directive was implemented in 2012 "[i]n response to highly publicized studies criticizing [an] increasing rate of detainee transfers." Roger C. Grantham, Jr., *Detainee Transfers and Immigration Judges: ICE Forum-Shopping Tactics in Removal*

*Proceedings*, 53 GEORGIA L. REV. 281 (2018). Available at: https://digitalcommons.law.uga.edu/glr/vol53/iss1/6. Even after the Transfers Directive's implementation, there remains an urgent need for strict adherence to its provisions. Among the ongoing dangers is the potential for ICE to abuse the established framework for detention of aliens. As observed by Roger Grantham, "because [Immigration Judge]s only hear cases in the immigration courts to which they are assigned, ICE effectively determines which IJ will preside over a detainee's case by transferring the detainee to a location within the IJ's jurisdiction." *Id.* at 301.

Theoretically, a uniform code of law would ensure fairness in any jurisdiction. However, "[a]s indicated by the wide variation in IJ decisions…the individual characteristics and background of the IJ deciding a detainee's case can be outcome determinative." *Id.* (citing Banks Miller, Linda Camp Keith & Jennifer S. Holmes, *Immigration Judges and U.S. Asylum Policy*, 16 (2015)). These conditions provide an opportunity for ICE to abuse the system, given that moving a detainee to a particular facility "not only determines who will hear the case, but also how the case will likely be decided." *Id.*

Furthermore, the transfer of detainees to detention facilities in rural areas has been observed to not only prevent them from accessing counsel, but also to "subject[] them to prolonged isolation from their families and networks of support." *Id.* (citing Ingrid Eagly and Steven Shafer, *A National Study of Access to Counsel in Immigration Court*, 164 U. PA. L. REV. 1, 40–42 (2015), and César Cuauhtémoc García Hernández, *Due Process Rights and Detainee Prison Transfers: Moving LPRs to Isolated Prisons Violates Their Right to Counsel*, 21 BERKELEY LA RAZA L.J. 17, 37-38 (2011)). These circumstances reduce the likelihood that a detainee can obtain relief from an immigration court, and so "ICE may use the transfer of detainees to particular locations to

reduce a detainee's ability to secure a favorable outcome." *Id.* at 301-302. Taken as a whole with "well-documented IJ tendencies…[and] the varying interpretations of the immigration consequences of criminal statutes among the Courts of appeals," a detainee's likelihood of success may be entirely changed solely by their transfer to a different facility. *Id.* at 302. Such acts of "judge shopping" on the part of ICE "offend[] notions of arbitral neutrality, fundamental justice, and legal ethics." *Id.* at 304.

Although concerns of "forum shopping" are present in other areas of law, such acts on the part of ICE should be recognized as "an extreme instantiation" of the concept, given ICE's power over the detainee and its ability to "manufacture a forum" by transfer. *Id.* at 304-305. These tactics also implicate the agency's attorneys, as criminal prosecutors have a responsibility "to temper zealous advocacy and seek justice in pursuing a case." *Id.* (citing Jason A. Cade, *The Challenge of Seeing Justice Done in Removal Proceedings*, 89 TUL. L. REV. 1, 21 (2014), and Erin B. Corcoran, *Seek Justice, Not Just Deportation: How to Improve Prosecutorial Discretion in Immigration Law*, 48 LOY. L.A. L. REV. 119, 157–60 (2014)).

### c. Application of the Directives to the Present Case

The record to date in Lucas' case provides no indication that proper procedure was followed by ICE in regard to either the Transfers Directive or the Parents Directives. Based upon the documented actions taken by ICE against Petitioner, any reasonable person would conclude that the agency's transfer determinations were not made in an effort to minimize such transfers, nor to reduce costs for the agency. *See* Transfers Directive ¶ 1. Nor is it clear whether such determinations were made based on a "thorough and systematic review of the most current information available" at the time of Lucas' detention. *Id.* ¶ 2.

More importantly, there was documentation to support the presence of Lucas' immediate family within the area of responsibility, as well as a form G-28 on record for Timothy Caron per the Request for Release submitted on January 29, 2025. *See* Exhibit E, Declaration of Eloa J. Celedon; *see also* Exhibit H, G-28 filed on January 29, 2025. It is not clear whether an Immigration Officer conducted a review to determine whether these factors were present in Lucas' case. *See* Transfers Directive ¶ 5.2(2). Additionally, *none* of the articulated reasons that may necessitate such a transfer are present in Lucas' case: he did not require medical or mental health care; he did not approve such a transfer; he was not a danger to other detainees or ICE personnel; there were no EOIR proceedings already in place; he did not have individual circumstances or risk factors necessitating such a transfer; the initial facility met ICE detention standards; and there were no indications of facility overcrowding that needed to be relieved or prevented. *Id.* ¶ 5.2(3).

After Lucas' initial transfer occurred, ICE failed to ensure that all necessary notifications were made to him and his attorney. *Id.* ¶ 5.3(1). The agency did not notify the attorney of record of the reason for the transfer, or the name, location, and telephone number of the new facility "as soon as practicable." *Id.* ¶ 5.3(2)(a). No "special security concerns" were present necessitating the delay of such information. *Id.* ¶ 5.3(2)(c).

In regard to the Parents Directives, ICE did not act to preserve Petitioner's parental rights, nor did it prevent the unnecessary disruption of said rights. *See* Parents Directive ¶¶ 1-2. Despite the fact that Lucas' minor child resides within the area of responsibility of his initial apprehension, the Field Office Director failed to refrain from subsequently transferring him outside of said area of responsibility. *Id.* ¶ 5.3(1). No evidence has been presented to indicate that the maintenance of custody was "impracticable" or that other exceptional circumstances were present. *Id.* Lucas did not remain "as close as practicable" to his daughter upon his detention.

## IV.    GOVERNMENT'S CONDUCT VIOLATED PETITIONER'S RIGHT TO COUNSEL

As previously claimed by Petitioner, the hindering of his access to counsel, which occurred on account of his repeated transfers and inability to regularly communicate with his spouse or counsel, qualifies as a violation of Petitioner's right to counsel.

In *Lara v. Barr*, 962 F.3d 45 (1st Cir. 2020), the First Circuit noted that federal law guarantees individuals in removal proceedings the right to be represented by the counsel of their choice at no cost to the government. *Id.* at 53 (citing 8 U.S.C. §§ 1362, 1229a(b)(4)(A)). In the case before it, the Court observed with respect to their removal proceedings, the petitioner had not actually had "the privilege of being represented…by such counsel…as [s]he shall choose." *Id.* at 55 (quoting 8 U.S.C. § 1362).

Given in part the petitioner's diligence in seeking an attorney, the First Circuit saw no justification for the Immigration Judge's denial of an additional continuance to allow an attorney to be present at a rescheduled merits hearing. *Id.* Therefore, the Court concluded that the Immigration Judge had failed to "meaningfully effectuate" the statutory right to counsel. *Id.* (citing *In re C-B-*, 25 I&N Dec. 888, 889 (BIA 2012)).

The First Circuit then looked to the issue of "whether a petitioner who was improperly denied counsel in immigration proceedings must demonstrate that the denial resulted in prejudice." *Id.* In its analysis of other circuit decisions, the majority approach did not require a showing of prejudice, "reasoning that a denial of counsel so fundamentally affects a proceeding that prejudice may be assumed." *Id.* (citing *Montes-Lopez v. Holder*, 694 F.3d 1085, 1092 (9th Cir. 2012); *see also Castaneda-Delgado v. Imm. and Natural. Serv*, 525 F.2d 1295, 1302 (7th Cir. 1975). The First Circuit also noted that *Matter of C-B-*, 25 I&N Dec. 888 (BIA 2012) indicates that for a denial

of the statutory right to counsel, as opposed to the denial of a continuance unrelated to the statutory right to counsel, a petitioner may not need to show prejudice. *Lara v. Barr*, 962 F.3d 45, at 56-57.

Placed in the context of the Trump Administration's extensive immigration enforcement activities, it is evident that Petitioner's detention and multiple transfers were part of a concentrated effort to keep him detained and away from counsel for as long as possible – even if such conduct may violate constitutional law. In view of these adverse actions, the importance of access to counsel has never been more critical.

## V.    RESPONSE TO RESPONDENT'S OPPOSITION TO EAJA FEES AND COSTS

Respondent asserts that Petitioner's claim for fees and costs under the Equal Access to Justice Act ("EAJA") is wholly without merit pursuant to Supreme Court and First Circuit precedent. *See* Respondent's Supplemental Response to Petitioner's Amended Petition for Writ of Habeas Corpus and Opposition to Petitioner's Request for EAJA Fees and Costs, at *4.

According to Respondent, Petitioner must show, *inter alia*, that he is a prevailing party in the civil action and that his fee petition was timely filed. *Id.* Only then would Respondent have the burden to show that their position was substantially justified or that special circumstances make an award against the government unjust. *Id.* (citing *Schock v. United States*, 254 F.3d 1, 5 (1st Cir. 2001); *Tang v. Chertoff*, 689 F. Supp. 2d 206, 210 (D. Mass. 2010)).

Respondent states that Petitioner is not a prevailing party. *Id.* (citing *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 606 (2001)). Respondent further asserts that Petitioner's habeas petition had no bearing on his seeking a bond hearing with the Immigration Judge and the Immigration Judge ordering him released. Respondent's Supplemental Response to Petitioner's Amended Petition for Writ of Habeas Corpus and Opposition to Petitioner's Request for EAJA Fees and Costs, at *6. Additionally, Respondent

asserts that Petitioner has not been awarded any affirmative relief by this Court per *Buckhannon*. *Id.* (citing 532 U.S. at 603); *see also Ortega v. Hodgson*, No. CIV.A. 11-10358-MBB, 2012 WL 1658931, at *3 (D. Mass. May 10, 2012) ("[d]espite the fact that petitioner achieved the desired outcome from the litigation, she only achieved that result through the respondent's voluntary conduct").

Petitioner should nonetheless be permitted to pursue EAJA fees. Although he has been released from immediate physical detention, Petitioner still seeks an award in the amount of $8000. This amount is equal to the bond posted by Pearsall Immigration Court – the venue which conducted Petitioner's hearing after his bad faith relocation to Texas by the government. Petitioner also seeks a *de novo* hearing before an Immigration Judge in Massachusetts – which would have been the proper jurisdiction for Petitioner but-for the government's acts of bad faith. In the present case, Petitioner is still seeking something that he may prevail on, not just the relief that has allegedly been rendered moot by his release from immediate physical detention. There is more at stake in the present case than simply the determinations made at the prior bond hearing. This case is also about the government's unconstitutional conduct against Petitioner when he was apprehended, detained, and transferred repeatedly.

Furthermore, it is likely that should such a *de novo* hearing be awarded to Petitioner, he would qualify as a prevailing party for purposes of EAJA.

## VI.    THE NEED FOR EXPEDITED DISCOVERY

In view of the foregoing, an order for expedited discovery – allowing for the deposition of the arresting officers and Acting ICE Director Todd M. Lyons, with all relevant documents – is essential to preserve the integrity of this Court's proceedings, and it will cause no undue prejudice to Respondent. Such discovery is necessary in order to establish the bad faith of the government.

## VII.    CONCLUSION

Petitioner respectfully requests that the Court consider this reply to Respondent's Supplemental Response and to Respondent's Opposition to EAJA Fees and Costs.

Respectfully submitted,

Timothy G. Caron
*Counsel for Petitioner*

Dated: March 28, 2025

## **Certificate of Service**

I, Timothy Caron, hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the NEF (NEF) and paper copies will be sent to those indicated as non-registered participants.

Dated: March 28, 2025

Timothy Caron, Esq.